**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
FRHUEB, INC.

                                               Plaintiff,

         -against-

THIAGO SABINO DE FREITAS ABDALA
and PRISCILA PATTO,

                                           Defendants.
-----------------------------------------------------------------X

**21-CV-7395 (RA) (KHP)**

**OPINION**

**KATHARINE H. PARKER, United States Magistrate Judge:**

Presently before the Court is Defendants' motion to disqualify Plaintiff's counsel. Defendants assert that Plaintiff's counsel, Archer & Greiner P.C. (hereinafter "Archer"), when previously representing Defendants, gained confidential and privileged information that Plaintiff's counsel may use in the instant litigation in violation of its duty to preserve confidences. For the reasons below, Defendants' motion to disqualify is DENIED.

## BACKGROUND

On September 2, 2021, Plaintiff through its counsel, Archer, filed a complaint against Defendants alleging trademark infringement, unfair competition, breaches of fiduciary duties, trademark dilution, misappropriation and related violations of the Lanham Act and New York statutory and common law. (ECF No. 1.)

In order to address the instant motion a brief recitation of the parties' relationship is required.[1] The Defendants, Thiago Abdala and Priscila Patto (who both also use the surname Hueb), are husband and wife and Brazilian natives. Abdala's grandmother and father started FR

---

[1] The history provided is recited from the parties' submissions related to the instant motion.

Hueb LTDA, a jewelry company, in Brazil. The Company name was derived from Abdala's grandmother's name. Abdala joined the family business in 2007 with the goal of expanding it globally. In 2008, at a trade show, Abdala met Rihan Mehta, whose family was in the gemstone business. The Mehta family owned and operated several related entities including Rosy Blue Trading LLC, Indian Fashion House LLC, 7Cs Diamond and Jewellery LLC and 7Cs Fashion House, all of which are purportedly affiliated with FR Hueb and allegedly had/have rights in the FR Hueb trademarks.

Abdala and Mehta decided to go into business together, and Abdala moved from Brazil to Dubai, United Arab Emirates to expand the company internationally. FR Hueb LTDA licensed the FR Hueb name and trademarks to Rosy Blue Trading for use outside of Brazil. In May 2014, the rights were transferred to Indian Fashion House, which later became 7Cs Fashion House (hereinafter "7Cs"). Abdala served as Brand Principal for the Hueb brand. He also served as Brand Principal, Manager of Business Development for 7Cs. At some point, a decision was made to develop the United States market and for Abdala to relocate to New York to manage the FR Hueb flagship store and expand to other cities. The Defendants moved to New York in 2015 and sought to obtain an L-1A visa so that they could work for 7Cs in the United States.[2]

The Mehta family used Archer for their companies' legal needs in the United States. Accordingly, Abdala requested Archer assist him and his wife/co-Defendant Patto, who was a jewelry designer and creative director for 7Cs, in obtaining employer-sponsored visas. Gregory Palakow, an immigration attorney at Archer, assisted Defendants. Palakow met with Defendants on a few occasions at Archer's Princeton, New Jersey office to discuss their

---

[2] The L-1A visa enables a U.S. employer to transfer an executive or manager from one of its affiliated foreign offices to one of its offices in the United States. The employee must be an executive or manager, who can operate at an executive capacity without much oversight. *See* https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1a-intracompany-transferee-executive-or-manager (last visited Dec. 20, 2021).

2

immigration status and visa applications.  At this time, Abdala inquired about changing his name legally to Hueb for personal and professional reasons.  Palakow advised him that he should wait on changing his name to avoid any complications in obtaining the visa.  Additionally, Palakow recommended accountants and financial planners to Abdala to aid him in getting his U.S. finances in order.  Notably, Archer did not enter into a separate engagement letter to represent Defendants personally in connection with the immigration work, nor did it enter into a joint representation letter or affirmatively tell Defendants that it did not represent them personally.  The legal fees in connection with the visa were paid by 7Cs, the sponsoring employer.[3]

     The Mehtas and Abdala had a falling out, resulting in Abdala and Patto separating from 7Cs.  Consequently, 7Cs withdrew its visa sponsorship of Abdalla and Patto, which required them to leave the country if they did not obtain other authorization to remain in the United States.  In December 2020, Palakow wrote an e-mail to Abdala informing him that his firm has a continuing relationship with 7Cs and could not further represent him absent a waiver from both parties.  Patto was not provided similar correspondence.  In the meantime, Defendants apparently hired other immigration counsel.

     Due to Palakow's assisting them with their immigration visa, Defendants now contend that "Archer was privy to privileged and confidential oral and written communications from the Defendants, regarding their education, professional activities, skills, involvement with the Hueb and Mehta family businesses over time" and that the "advice regarding how and when to formally change Defendants' name to Hueb intimately implicates Mr. Palakow and Archer in

---

[3] Defendants assert that the fees were later debited from Abdala's profit distributions from FR Hueb.

3

legal exploitation of the name and mark Hueb as it relates to Defendants."[4]  *See* Defs. Memo of Law (ECF No. 50.)  Lastly, Defendants assert that disqualification is warranted under the witness-advocate rule because Archer attorneys may be called to testify against their client about their knowledge of Defendants' use of the name Hueb.

## DISCUSSION

**I.  LEGAL STANDARD**

Motions to disqualify counsel are "committed to the discretion of the district court." *Fox v. Idea Sphere, Inc.*, 2013 WL 1191743, at *22 (S.D.N.Y. Mar. 21, 2013) (internal quotation marks and citation omitted).  The court's power to disqualify is derived from federal courts' "inherent power to preserve the integrity of the adversary process."  *Id.* (quoting *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005).  Courts in the Second Circuit typically disfavor motions to disqualify counsel because they interfere with the parties' ability to select their counsel of choice and are often interposed for tactical reasons.  *Id.* (citing *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)); see also *H&H Acquisition Corp. v. Financial Intranet Holdings*, 2000 WL 502869, at *1 (S.D.N.Y. Apr. 27, 2000) (disqualification motions "tend to derail the efficient progress of litigation").  Thus, "[i]n view of their potential for abuse as a tactical device, motions to disqualify opposing counsel are subject to particularly strict scrutiny."  *Scantek Med., Inc. v Sabella*, 693 F. Supp. 2d 235, 238-39 (S.D.N.Y. 2008) (citing *Correspondent Servs. Corp. v. J.V.W. Inv., Ltd.*, 2000 WL 1174980 at *14 (S.D.N.Y. Aug. 18, 2000).  Finally, when deciding a motion to disqualify, courts must strike a delicate balance between each litigant's interest in freely choosing its own counsel and ensuring that the underlying trial

---

[4] Defendants, in their moving papers, assert that Archer counseled Abdala regarding his stock interest in FR Hueb which is a relevant issue in this action.  However, Defendants do not include such statements in their declarations and Archer denies ever providing such legal advice.  Accordingly, the Court finds that Defendants have not met their burden and does not further consider this assertion.

4

is not tainted. *H&H Acquisition Corp.*, 2000 WL 502869, at *2 (citing *Felix v. Balkin*, 49 F. Supp. 2d 260, 267 (S.D.N.Y. 1999)).

The party seeking disqualification bears the burden of meeting a high standard of proof to show that disqualification is appropriate. *Felix*, 49 F. Supp. 2d at 267 (internal quotation marks and citation omitted). If the party moving for disqualification makes specific allegations that raise doubts about whether a conflict exists, such doubt should be resolved in favor of disqualification. *Id.* However, a party that merely articulates a suspicion of or future potential for conflict rather than a "real risk that the trial will be tainted" will fail to meet its burden. *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 388 (S.D.N.Y. 2010) (internal quotation marks, alteration, and citation omitted). Because ethical violations can typically be addressed by federal and state disciplinary mechanisms, a court should only disqualify an attorney when his or her conduct will taint the underlying trial. *Hempstead Video, Inc.*, 409 F.3d at 132 (citing *Board of Ed. of City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).

The threshold issue for successive conflicts under New York ethical rules and the Second Circuit is whether Defendants had an attorney-client relationship with the lawyer or firm sought to be disqualified. *Zappin v. Comfort*, 2019 WL 409831, at *3 (S.D.N.Y. Feb. 1, 2019). When determining whether an attorney-client relationship exists, a court considers several factors such as (1) whether a fee arrangement was entered into or a fee paid; (2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; and (3) whether the purported client believes that the attorney was representing him and whether this belief is reasonable. *BT Holdings, LLC v. Vill. of Chester*, 2015 WL 8968360, at *4 (S.D.N.Y. Dec. 14, 2015) (citation omitted). "In certain circumstances, disqualification may be appropriate when an attorney gains access to the confidences even of someone who is not

5

formally a client." *Blue Planet Software, Inc. v. Games Int'l, LLC*, 331 F. Supp. 2d 273, 276 (S.D.N.Y. 2004).

Where there is successive representation, an attorney may be disqualified if:

> (1)  the moving party is a former client of the adverse party's counsel;
> (2)  there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
> (3)  the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video Inc.*, 409 F.3d at 133 (quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983). "The substantial relationship test is met if the relationship between issues in the prior and present cases is patently clear, identical or [is] essentially the same." *Scantek Med., Inc.*, 693 F. Supp 2d at 239 (quoting *Gov't. of India v Cook Indus., Inc.*, 569 F.2d 737, 739-40 (2d Cir. 1978)) (internal alterations omitted).

Additionally, when a lawyer jointly represents a company and an employee, the party seeking disqualification must show the "attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client." *Allegaert v Perot*, 565 F.2d 246, 250 (2d Cir. 1977). This standard is derived from Rule 1.9(a) of the New York Rules of Professional Conduct, which provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." *See* New York Rules of Professional Conduct Rule 1.9.  However, "[i]f each client was aware of the other's relationship to the same lawyer, there is no basis to believe that confidences of one party would generally be withheld from the other." *Felix*, 49 F. Supp. 2d at 269 (citing *Allegaert*, 565 F.2d at 250).

6

As to the witness-advocate rule, lawyers are prohibited from acting "as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact." *Staff Mgmt. Grp. LLC v. Feltman (In re Corp. Res. Servs.)*, 595 B.R. 434, 445 (S.D.N.Y. 2019) (quoting New York Rules of Professional Conduct Rule 3.7). Further, "[w]here only the moving party intends to call the adversary's attorney as a witness, the movant must demonstrate both that the lawyer's testimony is necessary and that there exists a substantial likelihood that the testimony would be prejudicial to the witness-advocate's client." *Id.* (quoting *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 126 F.Supp.3d 413, 420 (S.D.N.Y. 2015).

**II.     Analysis**

In this case, the Court finds that an attorney-client relationship existed between Archer and Defendants with respect to immigration matters. Although there was no engagement letter and 7Cs paid Archer's fees, and although the work was for the benefit of the company insofar as it wished for Abdala and his wife to work at its New York store, the work also benefitted Defendants personally because it allowed them to work in the United States. Further, Archer provided ancillary immigration-related advice regarding the timing for seeking a name change and a green card (which would have permitted Defendants to work for any employer). It appears that Defendants viewed Archer as their personal immigration counsel, a belief that was reasonable given that the immigration forms themselves identified Archer as Defendants' representative. Both Defendants have submitted declarations stating they believed they were personally represented by Palakow. Clients, especially immigrants, may not understand the formalities of what is required to have a formal relationship with an attorney. Thus, it is the attorney's responsibility to define the scope of the engagement, and ambiguities as to whether an attorney-client relationship exists should be construed against the attorney. *See Blue Planet Software, Inc.*, 331 F. Supp. 2d at 276 ("[i]n certain circumstances,

7

disqualification may be appropriate when an attorney gains access to the confidences even of someone who is not formally a client."). Accordingly, for these reasons, I find there was an attorney-client relationship between Defendants and Archer with respect to their visa applications.

Despite the attorney-client relationship, disqualification is not warranted because Defendants cannot show that Archer or Palakow were in a position where they could have received information that Defendants might reasonably have assumed would be withheld from FR Hueb or 7Cs. *Allegaert*, 565 F.2d at 250. Archer and Palakow assisted Defendants in immigration matters only. Of critical importance, Defendants' visa applications were sponsored by 7Cs, and members of the Mehta family submitted attestations on 7Cs letterhead describing Abdala's and his wife's work experience, professional experience, and the desire to expand the Hueb brand in the United States. In other words, 7Cs, FR Hueb, and relatedly the Mehtas, were intimately involved in the scope of Defendants' work with Archer and fully aware of the information submitted to U.S. immigration authorities in connection with their visas. As such, it is implausible that Defendants assumed any information they conveyed was confidential as to them and would not be shared with the company. *See, e.g., Allegaert*, 565 F.2d at 250 (holding "[b]ecause Walston necessarily knew that information given to [the attorneys] would certainly be conveyed to their primary clients in view of the realignment agreement, the substantial relationship test is inapposite").

Nonetheless, assuming *arguendo* that Defendants can establish they reasonably assumed that the information given to Archer would not be shared with Plaintiff or 7Cs, Defendants fail to show that there is a substantial relationship between the subject matter of the prior representation (i.e., immigration) and the factual or legal issues raised in this case. Here, Plaintiffs are bringing claims of trademark infringement, unfair competition, breaches of

fiduciary duties, trademark dilution, misappropriation and related violations of the Lanham Act and New York statutory and common law.  The facts learned by Archer in representing Defendants are not confidential or secret, nor particularly relevant.  Defendants claim that Archer was aware of Defendants' desire to change and use the name Hueb for personal and professional reasons.  However, there is no dispute that Defendants used the surname Hueb prior to their departure from the company, that Hueb is a family name, and that Abdala, while an executive at 7Cs and Brand Principal with FR Hueb, used Hueb on his business card and company email signature.  Defendants' use of the name Hueb personally and professionally is distinct from their use of the marks Hueb or FR Hueb to compete with 7Cs and FR Hueb.  The issues to be resolved in this suit include whether the contractual sale/license and assignment of the Hueb mark to Plaintiff and related entities are valid and whether Defendants infringed on the mark and/or unfairly competed with their former employer.  In sum, the issues on which Archer advised Defendants were not substantially similar to the issues on which Archer is advising Plaintiff in this matter and for which it is prosecuting Defendants.  Thus, the substantial relationship test has not been met. *See Scantek Med., Inc.*, 693 F. Supp 2d at 240 (finding the substantial relationship was not met because the "prior representations simply have no relationship whatsoever to the present dispute—there are no overlapping factual or legal issues" and the submitted affidavit failed to satisfy the high burden of proof required).

Next, Defendants have failed to show Archer had access to or could have had access to relevant privileged information.[5]  In Defendants' declarations and moving papers, they claim to have provided Archer with information regarding their education, work activities, skills, and

---

[5] Defendants assert that they are entitled to an irrebuttable presumption that Archer had access to relevant privileged information because there is a substantial relationship in the subject matter.  *See Revise Clothing Inc.*, 687 F. Supp. 2d at 394-95.  Having found that Defendants have not shown a substantial relationship, the Court does not further consider this assertion.

9

involvement with businesses. As a threshold matter, this type of information is typically not privileged, and Defendants have not articulated any rationale on why it ought to be treated as such. Furthermore, the information furnished by Defendants were to be used in government submissions, further undercutting the argument that the information was privileged. Lastly, Defendants have failed to provide any evidence that Archer advised Defendants on any disputes between them and the Mehtas or the companies; rather, Defendants were fully aware that Archer was the Mehtas' and the companies' primary general counsel and preparing the visa applications so they could work for 7Cs. *See Revise Clothing Inc.*, 687 F. Supp. 2d at 395-97 (finding disqualification of counsel was not warranted because movant failed to show that counsel had access to relevant confidential information).

Lastly, the witness-advocate rule does not aid Defendants. From the submissions received by the Court there is no reason to conclude Archer's testimony is necessary to prove or defend the claims in this action. "[W]here only the moving party intends to call the adversary's attorney as a witness, the movant must demonstrate both that the lawyer's testimony is necessary and that there exists a substantial likelihood that the testimony would be prejudicial to the witness-advocate's client." *In re Corp. Resource Services, Inc.*, 595 B.R. at 445 (quoting *John Wiley*, 126 F. Supp. 3d at 420). While it is true Archer was aware that Defendants sought to legally change their name to Hueb and that Abdala's family name was Hueb, Defendants do not show why this information could only be provided by Archer. Accordingly, Defendants' have not shown that Archer should be disqualified under the witness-advocate rule.

## CONCLUSION

For the reasons stated above, the Court finds that Defendants have failed to carry their burden in showing that Plaintiff's counsel should be disqualified. Accordingly, Defendants' motion to disqualify is DENIED.

DATED:   New York, New York
         December 21, 2021

*Katharine H. Parker*
_____
KATHARINE H. PARKER
United States Magistrate Judge